*North Country Federal Credit Union v. Lamson*, No. 371-6-14 Wncv, (Teachout, J., March 17, 2015)

[The text of this Vermont trial court opinion is unofficial. It has been reformatted from the original. The accuracy of the text and the accompanying data included in the Vermont trial court opinion database is not guaranteed.]

# STATE OF VERMONT

**SUPERIOR COURT**                                              **CIVIL DIVISION**
**Washington Unit**                                    **Docket # 371-6-14 Wncv**

**NORTH COUNTRY FEDERAL CREDIT UNION,**
    **Plaintiff**

    **v.**

**CRYSTAL LAMSON and ROBERT LAMSON,**
    **Defendants**

## FINDINGS OF FACT and CONCLUSIONS OF LAW

This matter came before the Court for final hearing on the merits on January 22, 2015. Plaintiff is represented by Attorney Cynthia R. Amrhein. Defendants represented themselves. Post-trial memoranda were due by February 6, 2015 and one was filed on behalf of Plaintiff by Attorney Amrhein.

Plaintiff seeks judgment for moneys claimed due on an unsecured loan and a credit card loan, and for a deficiency on a vehicle loan following repossession and sale. Defendants argue that the unsecured and credit card debts were forgiven by Plaintiff based on a settlement agreement with Plaintiff, and that the vehicle was wrongfully repossessed in violation of the claimed settlement agreement and that therefore Plaintiff is not entitled to judgment for any deficiency.

### Findings of Fact

In January of 2011, Crystal and Robert Lamson applied for two loans from North Country Credit Union: a personal unsecured loan and a Visa credit card.

*Credit Card Agreement*

Defendants do not dispute that they received a copy of the credit card agreement they signed in connection with getting a Visa card with $5,000.00 authorized credit. Their credit limit was later increased to $10,000.00. They used the card to its maximum limit.

As of January 22, 2015, the principal was $10,000 and there was interest of $2,289.77 and late fees of $120.00 for a total of $12,409.77 with interest accruing at $4.6438 per day.

*Unsecured loan*

On January 31, 2011, the Defendants signed page 2 of a document entitled "LOANLINER Plan Opening Application and Signatures PLUS" seeking an "Amount requested" of $19,182.00. (Exhibit 1). It appears to be an application form in that it is so titled and uses "applicant" and "application" language.

In a block on page 2 entitled "Signatures," there are three numbered paragraphs above where the Lamsons signed. The first continues the 'application' format and begins with the sentence, "You promise that everything you have stated in this application is correct to the best of your knowledge." It continues with other sentences referencing terms of an application.

The second and third paragraphs state as follows:

2. You have received and read the LOANLINER Credit Agreement or LOANLINER Credit/Security Agreement, including the Addendum ("Agreement") and Borrower Copy of the LOANLINER Credit/Security Agreement PLUS and Voluntary Payment Protection. For Credit Insurance only, you understand that enrollment applies to all accounts under the Agreement. By signing below you agree to be bound by the terms of the Agreement.

3. You grant us a security interest in all individual and joint share and/or deposit accounts you have with us now and in the future to secure what you owe under the LOANLINER Credit Agreement or LOANLINER Credit/Security Agreement. When you are in default, you authorize us to apply the balance in these accounts to any amounts due. Shares and deposits in an individual Retirement Account, and any other account that would lose special tax treatment under state or federal law if given as security, are not subject to the security interest you have given in your shares and deposits.

The Lamsons signed immediately above these paragraphs. Under their signatures is a block entitled "For Credit Union Use Only." It has spaces for 'approved, denied, and approved limits.' The only space completed is the date, 31 JAN 2011. At the bottom of page 2 is the label, "Credit Union Copy."

Plaintiff's Exhibit 1 includes 4 additional unnumbered pages entitled "LOANLINER Credit/Security Agreement PLUS." Plaintiff contends that the Lamsons received a copy of these 4 pages at the time they signed page 2, and contends that all 6 pages together constitute the Lamsons' agreement with Plaintiff and are enforceable against the Defendants. Defendants testified that they received only the first two pages and never received the other 4 pages and did not have notice that those terms were part of the loan agreement.

2

The 4 pages in dispute are labeled at the bottom "Borrower Copy," unlike the first two pages which are labeled "Credit Union Copy." They are standard form printed pages and there are no signatures or initials or loan number or date or any other information on the disputed 4 pages showing a connection to a transaction with the Lamsons. The only evidence that the Defendants ever received those 4 pages and agreed to those terms comes from the fact that they signed page 2 under the statement in paragraph #2, which states that Defendants have received and read 3 out of 5 different documents, one of which is the disputed 4 pages, and evidence from Plaintiff's witness, a collections supervisor. She had no involvement in the transactions with Defendants. She testified about what "would have" happened based on her familiarity with standard procedures she used when she was responsible for loans at a prior time. She is now a supervisor. The copy of the 4 disputed pages included in Exhibit 1 produced by Plaintiff and admitted into evidence was taken from an electronically stored file. There is no evidence of business records of Plaintiff such as a checklist showing what identified documents were handed to Defendants on January 31, 2011 before they signed page 2.

The evidence is neutral as to whether the Defendants actually received a paper copy of the disputed 4 pages before they signed page 2 of Exhibit 1. Plaintiff argues that the Court should infer that they did, but the Plaintiff has the burden to prove the terms of any contract terms by a preponderance of the evidence, and has not met that burden to the preponderance standard as to the content of the 4 disputed pages. The Lamsons' signatures appear only on page 2 following what is primarily an application. The 4 disputed pages are, by the terms of paragraph #2, one of several different alternate documents that could have applied to the Lamsons' loan. They are boilerplate standard form pages, and they are labeled differently than the first two pages. There is no clarity that those 4 pages were part of a loan agreement or shown to or received by the Lamsons such that they agreed to those terms. Notable is that the only reference to interest to be paid on any borrowed funds is in the first paragraph on the first page of the 4 disputed pages, and that paragraph does not specify an interest rate but refers to a separate "Addendum" for identification of interest rate, and Plaintiff has not offered into evidence any Addendum as part of any agreement. Thus, Plaintiff has not shown what terms of interest Defendants agreed to as of January 31, 2011. In short, Plaintiff's evidence is not sufficient to prove that Defendants received a copy of all 6 pages of Exhibit 1 (or the Addendum either) or that their signatures signified an agreement to the terms contained in the disputed 4 pages.

The 4 disputed pages are important because terms on those pages became part of the parties' dispute in this case and Plaintiff contends that the terms in those pages were agreed upon by Defendants, specifically:
1. provisions at paragraph 12 that provide that if Defendants are in default on any other loan, they are also in default on this one;
2. provisions at paragraph 13 that Defendants are responsible for attorneys' fees in the event of collection; and
3. a cross-collateralization clause at paragraph 16.

As stated above, the evidence does not show by the required standard of proof (preponderance of the evidence) that the Defendants obligated themselves to those terms. Nonetheless, the Defendants acknowledge that they borrowed the funds, and have not repaid them in full. They do not deny the amount of interest claimed by Plaintiff if they are obligated to pay the debt. Their primary defense to Plaintiff's claim is that Plaintiff agreed to waive the Visa and unsecured loans as part of a settlement agreement and reneged on that agreement and subsequently relied on the cross-collateralization clause in repossessing a car when the Defendants had no knowledge of the cross-collateralization clause in the disputed 4 pages.

In October of 2011, Defendants' balance on the unsecured loan was $5,866.95. They requested additional funds and accepted a check for a $1,000.00. The document relied on by Plaintiff is a document entitled "Open-End Disbursement Receipt PLUS" that is not signed by Defendants. It does provide that by endorsing the proceeds check, the Defendants agreed to make payments "as disclosed above," which provided for an annual percentage rate of 9.74% and monthly payments of $220.82 beginning November 12, 2011.

As of January 22, 2015, the principal balance was $5,728.77 plus accrued interest of $1,240.13. Plaintiffs also claim late fees of $14.04 for a total of $6,982.94 with interest accruing at $2.6274 per day.

*Honda vehicle loan*

In September of 2012, the Defendants borrowed additional money to purchase a Honda vehicle. It is this loan on which Plaintiff claims a deficiency. The document relied on by Plaintiff is Exhibit 8, which is entitled "Open-End Disbursement Receipt Plus" and is identical to the one related to the $1,000 advancement except that attached to it are the same 4 pages that are in dispute with respect to Exhibit 1. Again, Defendants dispute that they ever received the additional pages (prior to the filing of this lawsuit).

Exhibit 8 shows $21,380.76 advanced with the same interest rate of 9.74% and monthly payments of $393.38, and it lists a 2011 Honda Accord as security. The Defendants do not dispute that they borrowed this money to purchase a Honda, nor that the Honda was security for the loan. The Receipt specifies that by endorsing the proceeds check the Defendants agree that the vehicle is security under the terms of the "LOANLINER Credit and Security Agreement" and is also security for any other loans that the Defendants have with the credit union "now or in the future." Plaintiff's witness testified that the basis of liability and terms are in the original Loanliner Security Agreement (the disputed 4 pages), which constitute a single agreement that allows customers to borrow funds at different times for different purposes all under a single loan agreement.

4

At some unknown point, Defendants borrowed money to purchase a Sierra vehicle. That loan has been repaid and there is no claim relating to that loan. It was, however, an active loan in December of 2013.

On December 2, 2013, Plaintiff sent Defendants a letter stating that they were in default on the Honda loan and Plaintiff intended to repossess the vehicle. The letter specified that the amount necessary to cure the default was $1,176.60, which would need to be paid by December 12, 2013. The letter did not reference any other loans, or invoke the cross-collateralization clause. The same day Defendants also received a letter that they were in default on the unsecured loan and that $1,365.46 would need to be paid by the same date. They were apparently also behind on the Sierra loan.

Crystal Lamson submitted some payments and engaged in email correspondence with Adam Lougee, the collection specialist with whom they were working, about resolution. On December 13, 2013, he wrote, "You have deposited enough to get one of your auto loans current, but there isn't enough to address the other parts of your account. I mailed four letters to you, three of which expired yesterday, and the one regarding the Honda expires tomorrow. Can you let me know what you can come up with by the end of the month? We are currently at a point where we need to talk about surrendering a vehicle. Please let me know your thoughts." Crystal Lamson responded that she intended to deposit enough funds the following week to make both the auto loans and the personal loan current.

Mr. Lougee emailed on December 26, 2013: "It looks like we will be charging off your Visa and unsecured loan. I think at this point, if you intend to keep both vehicles, you should focus on getting your auto loans caught up. . . . I need at least $54.46 for loan 1 [Sierra loan] before 12/31. Let me know if you have any questions." Crystal Lamson responded immediately that the $54.46 would be there by the 31st. "This will make the payments for both auto loans current correct? Next payment on both auto loans will be due for January 2014? Is that what you are telling me."

He responded (1:36 pm) with specific information about the amounts and due dates that showed that even with the payments specified, both loans would be behind but by less than 60 days. "If you can maintain regular payments after this then I'll have some room to work with you." He made recommendations about how to bring the vehicle loans current, and asked if she had completed the financial hardship application he had sent that might make a loan modification possible. She asked for more clarification (1:57 pm), and he answered (2:39 pm) that the "total needed to get both loans current is $1,194.50" and specified that the next due dates for the vehicle loans would be on 1/2/14 and 1/14/14.

Crystal Lamson emailed on December 30, 2013 that she would bring a payment of $1,194.50 to the Credit Union after 4:00 pm that day "which will bring both the auto loans up to date" and invited him to check the account around 4:30, which he responded that he would do. She apparently did make the payment. Exhibit 23 shows that on that

5

day a payment was made on the Honda loan. However, the next payment due on January 14, 2014 was not made.

Defendants' argument is that on December 26, 2013, Adam Lougee offered to "charge off" the Visa and unsecured loans if they brought the auto loans current by the end of December, and that they did bring the auto loans current by the end of the month, so that they should have no liability on the Visa and unsecured loans.

The term "charge off" relating to loans is an accounting term that means that the Credit Union no longer shows an outstanding loan balance on its books as an asset for federal regulatory purposes. As a technical accounting term, it does not mean that a credit union or bank legally relinquishes the right to pursue collection of the debt or waives right to repayment. This was not explained to the Defendants and they might reasonably have understood the term to mean that the loans would be waived, **if** that were a reasonable overall interpretation of Mr. Lougee's communications.

However, the full context of the emails (Exhibits A and B) does not support that Mr. Lougee made them such a clear offer for a settlement that would include waiver of over $15,000 of loan principal plus outstanding interest. First of all, there was no offer of a "deal." Rather, Mr. Lougee merely said "it looks like" (we will be charging off the loans). Furthermore, it was a statement in an email on December 26th that was followed by many more email exchanges in which Mr. Lougee talked about having "some room to work with you" in the future if they were able to maintain future payments, and encouraged them to fill out financial hardship paperwork concerning a possible loan modification. In context, it was reasonable for the Lamsons to rely on the fact that if they brought the auto loans current as of the end of December, they could avoid the repossession of the Honda referred to in the December 2nd letter, although **only** if they also maintained the loans current thereafter as well. It is not reasonable for the Lamsons to have understood that if they brought the auto loans current as of the end of December, the Credit Union would totally forgive the balances on the Visa and unsecured loans, especially if they failed to keep auto loans current after December 31, 2013.

The next payment on the Sierra was due on January 2, 2014 and the next payment due on the Honda was due on January 14, 2014. Neither payment was made.

On January 17, 2014, Plaintiff sent Defendants a letter of intent to repossess the Sierra vehicle. The letter referenced default on the Sierra loan, the unsecured loan, and the Visa loan, and that $4,052.92 would need to be paid to prevent repossession. Crystal Lamson emailed Mr. Lougee, stating that the Lamsons had brought the vehicle loans current as agreed and they believed that the Credit Union had no grounds to proceed with repossession. Mr. Lougee emailed in response that the Credit Union had decided to "go another route" and invoke the cross-collateralization clause and pursue repossession of the Sierra for nonpayment of all the loans on the grounds that the vehicle was collateral for all the loans under the cross-collateralization terms in the loan documents. The Lamsons were upset. However, they paid off the Sierra loan. It was in connection with

6

the Sierra loan that Plaintiff invoked the cross-collateralization clause, but that loan was paid off and is not involved in this case.

No payment was made on the Honda loan in January and the Credit Union repossessed the Honda on February 1, 2014. The principal balance was $18,566.87. By letter of February 3, 3014, it notified the Lamsons of their right to redeem by payment of $22,667.96, which included interest and other repossession fees and costs, and of the upcoming sale. The evidence shows that the amount due was not determined by invoking the cross-collateralization clause. Only the amount due on the Honda loan was sought. The Lamsons did not redeem. The Honda sold at auction for $12,200.00. Plaintiff seeks a deficiency judgment.

As of January 22, 2015, the principal balance was $6,351.02 plus accrued interest of $498.26. Plaintiff also claims late fees of $19.67, repossession fees of $525, selling fees of $265.00, and cleaning fees of $90.00 for a total of $7,748.95 with interest accruing at $1.6948 per day.

*Attorneys' Fees*

Plaintiff seeks attorneys' fees in the amount of $5,575.25 for pursuing this suit related to all three loans. In connection with the unsecured and Honda loans, Plaintiff relies on paragraph 13 on the disputed 4 pages, and on provisions of the Uniform Commercial Code at 9A V.S.A. Sec. 9-607(d); 9A V.S.A. Sec. 9-608(a)(1)(A), and 9A V.S.A. Sec. 9-615(a)(1).

The amount of attorneys' fees requested is reasonable for the work performed. However, the Court has found that Plaintiff did not prove that Defendants received the disputed 4 pages, and therefore the terms in those pages are not enforceable against Defendants. The disputed 4 pages include paragraph 13, which would have authorized attorneys' fees with respect to the unsecured and Honda loans.

The Court has examined Exhibit 7, which contains the terms applicable to the Visa loan and which the Defendants did receive and to which they agreed. The Court has been unable to find a provision in Exhibit 7 that provides for attorneys' fees in connection with collection of the Visa loan.

**Conclusions of Law**

Plaintiff has proved that it loaned the funds on each of the three loans at issue and that they have not been repaid. Defendants do not dispute the amounts. Their defense is that they relied on Mr. Lougee's statement that the Visa and unsecured loans would be "charged off" if they brought the two auto loans current as of the end of December of 2013 and that they did that, and that Plaintiff was not entitled to rely on the cross-

7

collateralization clause in repossessing the Honda because they had not agreed to the terms on the disputed 4 pages.

There was no express agreement that the Visa and unsecured loans would be forgiven if the auto loans were made current as of December 31, 2013. Rather, Defendants seek to rely on the doctrine of promissory estoppel: that they reasonably relied on Mr. Lougee's representation, and acted on it to their detriment by paying to bring the auto loans current as of December 31, and therefore Plaintiff should be held to Mr. Lougee's representation and not allowed to collect the Visa and unsecured loans. As the Findings of Fact show, however, it was not reasonable for the Defendants to rely on Mr. Lougee's statement for the results they seek of complete forgiveness of both the Visa and unsecured loans.

First, his statement was not a clear statement of a representation that would justify the Defendants in relying on it. It was introduced by the language "it looks like. . .[we will be charging off the Visa and unsecured loans]" rather than a statement that 'if you do X, we will do Y.' Furthermore, it was part of an ongoing conversation about what the Lamsons could do about being behind on four loans and the conversation included an invitation for them to apply for a hardship modification. Finally, even if looked at in the light most favorable to the Lamsons, what was offered to them was the avoidance of repossession of the vehicles only if they brought the auto loans current by the end of the month **and** kept them current thereafter, which they did not do. Thus, the Defendants have not shown a valid defense to the claims on the Visa and unsecured loans.

While the Court has found that the Plaintiff has not proved by a preponderance of the evidence that the disputed 4 pages were given to the Defendants, and therefore the terms therein cannot be enforced against Defendants, the interest sought by Plaintiff is less than the legal rate of interest (12%) that would be otherwise applicable if there were no specific interest rate, so the Plaintiff's claim for interest is reasonable. Late fees on the unsecured and Honda loans will not be allowed, as they are not provided for in the documents proved by Plaintiff.

With respect to the Honda loan, the evidence shows that no payment was made in January so the loan was not current, and that in using the proceeds of the Honda loan the Defendants had given a security interest in the Honda to the Plaintiff under the terms of Exhibit 8. Thus the Plaintiff was entitled to pursue repossession of the Honda as security for that loan. The evidence also shows that the Plaintiff did not invoke the cross-collateralization clause in connection with the amount needed to prevent repossession and sale of the Honda. Therefore, even though the Plaintiff did not prove the entitlement to invoke the cross-collateralization clause contained in the disputed 4 pages, it is not relevant to the claim for deficiency on the Honda loan.

Finally, because Plaintiff did not prove the right to rely on terms in the disputed 4 pages, it cannot rely on paragraph 13 in those disputed 4 pages as a basis for attorneys' fees with respect to the unsecured and Honda loans. The loan agreement for the Visa loan does not provide for attorneys' fees.

8

This leaves the question as to whether the Uniform Commercial Code provisions cited provide a basis for collection of attorneys' fees with respect to the Honda loan. 9A V.S.A. § 9-607(d) provides for attorneys' fees for a secured party "if so agreed." This does not apply to the Honda loan because of lack of agreement due to the absence of proof of paragraph 13 of the disputed 4 pages as part of the agreement. 9A V.S.A. § 9-608(a)(1)(A) also only provides for attorneys' fees to the extent provided for in the agreement. The same is true for 9A V.S.A. § 9-615(a)(1). Because Plaintiff has not proved paragraph 13 on the disputed 4 pages was part of the parties' agreement, Plaintiff has not shown an entitlement to attorneys' fees.

**Summary**

Based on the foregoing findings and conclusions, Plaintiff is entitled to the amounts claimed for principal and interest on the three loans at issue, and interest to date of judgment, and costs of filing and service, but not to late fees on the unsecured or Honda loans and not to attorneys' fees.

Plaintiff's counsel shall prepare a proposed Judgment.

Dated this _____ day of March, 2015.

_____
Mary Miles Teachout
Superior Court Judge

9